1

2

3

4

5

6

7

8                  **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ROLANDO RENDON,                    )  NO. CV 10-1468-SS
                         Plaintiff,    )
12                                     )
                 v.                    )  **MEMORANDUM DECISION AND ORDER**
13                                     )
    MICHAEL J. ASTRUE,                 )
14  Commissioner of the Social         )
    Security Administration,           )
15                                     )
                         Defendant.    )
16  _____)

17

18                              **I.**

19                         **INTRODUCTION**

20

21       Plaintiff Rolando Rendon ("Plaintiff") brings this action seeking

22  to overturn the decision of the Commissioner of the Social Security

23  Administration (hereinafter the "Commissioner" or the "Agency") denying

24  his application for Social Security Income benefits ("SSI").   The

25  parties consented to the jurisdiction of the undersigned United States

26  Magistrate Judge, pursuant to 28 U.S.C. § 636(c).   For the reasons

27  stated below, the decision of the Agency is AFFIRMED.

28  \\

# II.

## PROCEDURAL HISTORY

Plaintiff filed an application for SSI on December 17, 2007, alleging a disability onset of July 1, 2007, due to hemorrhoids and depression. (Administrative Record ("AR") 166, 184). The Agency denied Plaintiff's claim on February 22, 2008, as well as at the reconsideration level on June 17, 2008. (AR 93, 98-99).

On August 13, 2008 Plaintiff requested a hearing before an Administrative Law Judge. (AR 105, 114). Plaintiff's hearing was held on October 19, 2009 before Administrative Law Judge Lowell Fortune (the "ALJ"). (AR 54-88). On December 4, 2009, the ALJ issued an unfavorable decision. (AR 9-21). Plaintiff appealed the ALJ's decision on December 22, 2009. (AR 6-7). The Appeals Council denied his request for review and the ALJ's decision became the final decision of the Commissioner.[1] (AR 1-3). Plaintiff's Complaint, filed on September 29, 2010, seeks review of Defendant's decision denying him disability benefits.

\\
\\
\\
\\
\\

---

[1] The Appeals Council received the following additional evidence: (1) medical records from the San Bernardino County Dept. of Behavior Health, (2) the medical record from J. Robert Evans, M.D., (3) a Psychiatric/Psychological Impairment Questionnaire from Marcia Hudson, M.D. dated June 9, 2010, and (4) a brief from Douglas A. Kugal, Esq. dated January 27, 2010. (AR 4-5).

**III.**

**FACTUAL BACKGROUND**

Plaintiff was born on November 30, 1961 and has a twelfth-grade education. (AR 166, 189). Prior to onset of the alleged impairments, Plaintiff worked as a care provider for an in-home support service, performed general labor at a golf course, worked as a meat wrapper, and a roofer. (AR 185, 264). Plaintiff asserts that he is disabled due to hemorrhoids and depression. (AR 184).

**A.    Plaintiff's Physical Medical History**[2]

Plaintiff suffered from "a five-year history of intermittent bleeding hemorrhoids" and underwent hemorrhoid surgery in September 2007 and February 2008. (AR 317, 331, 333-34). Plaintiff's medical records note that Plaintiff had no other "significant past medical history." (AR 321). After the February 2008 procedure, Plaintiff was "taken to the recovery room in satisfactory condition." (AR 335). Plaintiff's surgeon, John P. Kearney, M.D., noted that the internal hemorrhoids which "were the most likely source of the bleeding . . . were all excised." (AR 334). The final microscopic diagnosis of the internal

---

[2]    The Court notes that Plaintiff does not clearly challenge the ALJ's findings regarding Plaintiff's alleged exertional limitations. (See Memorandum in Support of Complaint ("Compl. Mem.") at 4-18). Plaintiff previously noted in his request for reconsideration before the Appeals Council that although his physical conditions were "perhaps not as acute as they were in late 2007 and early 2008, [they] have not resolved and continue to affect his functional abilities." (AR 272). Nevertheless, Plaintiff does not directly address these limitations in his Memorandum and instead focuses his contentions on the ALJ's evaluation of Plaintiff's mental health. (Compl. Mem. at 4-18).

hemorrhoids showed benign anorectal hemorrhoidal tissue and no evidence of malignancy. (AR 336, 620). Plaintiff was hospitalized for vomiting after the surgery. (AR 415-17).

On February 13, 2008, Dr. Leonard H. Naiman completed a case analysis and noted that Plaintiff is "[a]ble to perform hhc's, shop, [and] drive . . . [but that he has] [c]ontinual pain due to hemorrhoids." (AR 281). Dr. Naiman opined that she "anticipated that by 7-1-08, one year after AOD of 7-1-07, this individual will have responded to the prescribed treatment program, this individual will have no significant functional limitations, and the impairment would not have persisted twelve months and would be considered non-severe by program standards." (AR 282).

In an April 2008 post surgery follow-up visit, Plaintiff's progress note indicated that he experienced moderate pain. (AR 621). In June 2008, Dr. Kearney's records indicate that Plaintiff still had "persistent pain and intermittent bleeding since [the operation], although to a lesser degree." (AR 627). Dr. Kearney also noted that "[Plaintiff] ha[d] no active bleeding apparent." (AR 628). In 2009, Plaintiff underwent two out-patient cautery procedures. (AR 60-61, 678-79, 683-89, 700, 742-45).

Neurologist Purnima Thakran began treating Plaintiff in August 2008 for bilateral leg pain and numbness, as well as memory loss from his fall from a roof. (AR 271, 758-775). In September 2008, Plaintiff underwent an esophagogastroduodenoscopy (EGD) which showed a small hiatal hernia. (AR 623). On November 21, 2008, Plaintiff reported to

Dr. Thakran that he had experienced four "black outs." (AR 759). Plaintiff underwent a colonoscopy with biopsy in January 2009. (AR 794-96). Dr. Robert Evans reported that the "[f]inding was suggestive of a benign lesion" and he noted that Plaintiff's "immediate and remote [prognosis was] good." (AR 795-96).[3] In January 2009, Plaintiff was diagnosed with internal hemorrhoids and rectal bleeding. (AR 746). On February 16, 2010, Dr. Robert Evans noted that Plaintiff had rectal bleeding. (AR 785).

Plaintiff testified that Dr. Ashraf Eskander is his primary doctor. (AR 77). On May 2, 2008, Dr. Eskander found that Plaintiff "is totally disabled without consideration of any past or present drug and/or alcohol use." (AR 366). The record contained no treatment notes or progress reports from Dr. Eskander to support his conclusion.

In July 2009, consultative examiner Dr. Sandra Eriks examined Plaintiff and completed an internal medicine evaluation. (AR 700). Plaintiff informed Dr. Eriks that "his most recent hemorrhoid surgery was done on an outpatient basis, with 'no anesthesia,' earlier this month." (AR 700). Plaintiff reported to Dr. Eriks that he suffered "of not only bright red blood per rectum, but [also] black tarry stools that are difficult to wipe away . . . [but that] [h]e has not been seen by his physician for either of these problems." (AR 700). Dr. Eriks reported that Plaintiff has "[n]ormal active bowel sounds." (AR 702).

_____

[3] The Court notes that Dr. Evan's records were not received by the Agency until after the ALJ's decision on December 4, 2009. (See AR 4-5, 9-21, 784-804). The Appeals Council considered the additional medical records when it denied Plaintiff's request for review on July 20, 2010. (AR 4-5, see also AR 1-3).

Dr. Eriks noted that although Plaintiff "states that he has numbness on both sides of his body, not worse in any specific area . . . [h]e has no difficulty with his normal activities, which he describes as cooking, cleaning, shopping, and laundry. . . . [Plaintiff] lives alone and takes care of himself." (AR 700). Upon completing a physical exam Dr. Eriks noted that Plaintiff "is well developed, well nourished, and in no apparent distress." (AR 701). In her assessment Dr. Eriks noted that Plaintiff's impairments do not affect his ability to lift and carry, stand and walk, sit, manipulate his hands, or communicate. (AR 707-09). Dr. Eriks opined that Plaintiff has no postural or environmental limitations. (AR 708-10).

## B. **Plaintiff's Mental Heath History**

### 1. **Dr. Gurmeet S. Multani**

Dr. Gurmeet S. Multani reported treating Plaintiff from October 15, 2007 until March 2008. (AR 62, 277, 661). Dr. Multani stated that he examined Plaintiff once a month. (AR 277). Dr. Multani noted on a February 2008 evaluation form for mental disorders that "[Plaintiff] has been feeling depressed and anxious." (Id.). He further reported:

> [Plaintiff] gets easily angered. He feels frustrated. [Plaintiff] has poor self-esteem and is poorly motivated. Patient has feelings of helplessness, hopelessness and worthlessness. [Plaintiff] is isolative (sic) and withdrawn. [Plaintiff] has been feeling overwhelmed. [Plaintiff] has insomnia and decreased energy. [Plaintiff] has poor ability

1  to carry out tasks. [Plaintiff] is unable to deal with
2  problems and issues. [Plaintiff] has poor ability to cope.

4  (Id.). Dr. Multani noted that Plaintiff "has a previous history of
5  depression." (Id.). Dr. Multani also opined that Plaintiff "is calm,
6  cooperative, has good eye contact and is fairly verbal and expressive."
7  (AR 278). Dr. Multani continued by noting that "[Plaintiff's]
8  [j]udgment is fair, [his] [i]nsight is fair, [but that his]
9  [c]oncentration is poor. [Plaintiff is] of average intellect and [his]
10 fund of knowledge is appropriate for [his] age and educational level."
11 (Id.). In terms of his mood, Dr. Multani opined that Plaintiff's had
12 no mood swings and that his affect is appropriate to mood. (Id.). Dr.
13 Multani found that "[Plaintiff] is able to deal with reality. [He] does
14 not present any delusions, hallucinations, paranoid ideations,
15 confusion, and mood swings." (Id.). In addition, Dr. Multani noted
16 that Plaintiff has "[n]o grossly disorganized behavior or looseness of
17 association." (Id.).

19     In terms of Plaintiff's level of functioning, Dr. Multani found
20 that "[Plaintiff] does not need assistance or direction to properly care
21 for personal affairs, do shopping, use transportation, pay bills,
22 maintain residence, care for grooming or hygiene." (AR 279). Dr.
23 Multani opined that Plaintiff had "difficulty interacting appropriately"
24 and that he "has poor concentration." (Id.). Yet Dr. Multani noted
25 that Plaintiff "can complete everyday household routines and follow and
26 understand simple written or oral instructions." (Id.). Dr. Multani
27 found that "[Plaintiff] is able to carry out tasks and work on goals and
28 issues. [He] should be able to go for training for work or

apprenticeship for eight hours a day." (Id.). In addition, Dr. Multani
noted that "[Plaintiff] is able to take care of funds and basic needs."
(AR 280). Dr. Multani diagnosed Plaintiff with Major Depressive Episode
and noted that "[Plaintiff's] condition can be expected to improve."
(AR 279-80). The ALJ noted that Dr. Multani's "[t]reatment notes [were]
not provided and a comprehensive mental status examination [was] not
elucidated." (AR 16).

In February 2008, Dr. Multani noted that Plaintiff "currently takes
[m]arijuana fro (sic) his nerves and to stimulate appetite." (AR 277).

## 2. Dr. Marcia Hudson

Treatment records indicate that Dr. Marcia Hudson and her
colleagues at the San Bernardino County Department of Behavioral Health[4]
treated Plaintiff from April 2008 until September 2009. (AR 28, 61,
368-77 651, 656-57). On November 4, 2008, Dr. Hudson completed a
psychiatric/psychological impairment questionnaire. (AR 668-76). Dr.
Hudson diagnosed Plaintiff with depression and she noted that Plaintiff
has poor memory, sleep disturbance, mood disturbance, delusions or
hallucinations, recurrent panic attacks, difficulty thinking or
concentrating, and generalized persistent anxiety. (AR 670). Dr.
Hudson noted that Plaintiff's panic attacks interfere with his ability
to work. (AR 674). Yet, in her October 2, 2008 treatment notes, Dr.
Hudson noted that Plaintiff's medication was "effective" and that he was

---

[4] The San Bernardino County Department of Behavioral Health is also
referred to as the Phoenix Community Counseling Center in the record.
(See AR 650).

"sleeping well." (AR 657). Plaintiff denied suicidal and homicidal ideations as well as auditory and visual hallucinations. (Id.). In September 2009 Dr. Hudson reported that Plaintiff was "well groomed" and had an "improved mood." (AR 750).

On July 15, 2009, the Social Security Administration sent Dr. Hudson a letter in which it stated that Dr. Hudson's records "do not provide [the agency] with the information . . . need[ed] to properly evaluate [Plaintiff's] impairments and/or disability." (AR 138). The Agency specifically asked Dr. Hudson to "identify the objective clinical data which in [her] view support each assessment of 'markedly limited.'" (Id.). The ALJ noted in his December 4, 2009 decision that he "wrote to Dr. Hudson to give her the opportunity to explain her opinions, . . . . [h]owever, there has been no response" as of the date of his decision. (AR 17).

The Appeals Council received a Psychiatric/Psychological Impairment Questionnaire dated June 9, 2010 as well as additional medical records from Dr. Hudson. (AR 776-783, 808-820).[5] The Appeals Council considered the additional questionnaire and medical records when it denied Plaintiff's request for review on July 20, 2010. (AR 4-5, see also AR 1-3). Dr. Hudson noted on December 17, 2009 that Plaintiff denied suicidal / homicidal ideations and auditory hallucinations. (AR 780).

\\

---

[5] The Court notes that Dr. Hudson completed the June 9, 2010 Psychiatric/Psychological Impairment Questionnaire after the ALJ's decision on December 4, 2009. (See AR 4-5, 9-21, 776-783, 805-820).

### 3.  Dr. Sandra Eriks, Consultative Examiner

With respect to Plaintiff's mental capacities, Dr. Eriks reported that Plaintiff "is oriented to person, place and time.  He responds in an appropriate manner.  [His] [m]ood is appropriate [and his] [m]emory is grossly intact."  (AR 703).

### 4.  Dr. H.M. Skopec

Dr. H. M. Skopec completed a mental residual functional capacity assessment on February 14, 2008.  (AR 283).  Dr. Skopec noted that Plaintiff's understanding and memory are not significantly limited and that Plaintiff's concentration and persistence are only moderately limited.  (Id.).  Dr. Skopec found that Plaintiff is not significantly limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (AR 284).  Dr. Skopec noted that Plaintiff's ability to interact appropriately with the general public is moderately limited, but that his ability to accept instructions and respond appropriately to criticism from supervisors, his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness are not significantly limited.  (Id.).  Dr. Skopec found no evidence of limitations in Plaintiff's ability to adapt.  (Id.).  Dr. Skopec concluded that "[Plaintiff is] partially credible with MDI, but overall considering the mental status exam and the ADLs [activities of daily living], it appears

10

that the [Plaintiff] can sustain simple repetitive tasks with adequate pace and persistence, can adapt and relate to co-workers and supervisors but likely cannot work with the public."  (AR 285).

### 5.    Dr. Linda Smith, Consultative Examiner

Psychiatrist Linda M. Smith conducted a complete psychiatric evaluation of Plaintiff on July 13, 2009.  (AR 690).  Dr. Smith noted that "[Plaintiff] was not credible throughout the interview."  (Id.). Dr. Smith opined that Plaintiff was unable to describe or give examples of his symptoms.  (AR 690-91).  Dr. Smith noted many discrepancies in Plaintiff's examination.  For example, she explained that although Plaintiff stated in a mental disorder evaluation in February 2009 that he specifically did not have any psychosis or hallucinations, he told her that he has heard voices for years.  (AR 691).  Dr. Smith opined that Plaintiff is a "very strong positive responder" and concluded that "[Plaintiff] is considering what he wanted to say because he was not sure what the 'correct' answer was."  (Id.).  Dr. Smith noted that she "[kept] trying to get more details and [Plaintiff was] very evasive and this appear[ed] to be deliberate."  (AR 692).

After listening to Plaintiff describe his last suicide attempt in 2004 and asking for more details, Dr. Smith concluded that "[t]here is no homicidal ideation. [Plaintiff] may have had some thoughts of harming people in the past but no longer."  (AR 692).  Dr. Smith also noted that "[Plaintiff] has never been hospitalized in a psychiatric ward."  (AR 692).  Dr. Smith opined that "[t]here was no evidence at all of any

thought disorder or psychosis" and that his "thought processes were entirely clear and linear and he was coherent and organized." (AR 695).

With respect to his intellectual functioning Dr. Smith found that "[Plaintiff] was alert and oriented in all spheres. He appeared to be of at least average intelligence." (Id.). Dr. Smith concluded that Plaintiff "[was] not credible throughout the interview." (AR 697). She found that "[t]here is certainly no evidence of bipolar disorder or schizoaffective disorder or schizophrenia." (Id.). Dr. Smith also noted that "[t]here is no evidence of depression" and that "[she did] not believe [Plaintiff] is impaired in his ability to work if [Plaintiff] continues to abstain from substance [abuse] and gives fair effort." (Id.). In terms of Plaintiff's functional abilities, Dr. Smith stated that Plaintiff is not impaired in his ability "to interact appropriately with supervisors, coworkers, or the public," "to comply with job rules such as safety and attendance," or "to maintain persistence and pace in a normal workplace setting." (Id.).

Dr. Smith noted in her report that "[Plaintiff] used to drink a 12-pack of beer per day and stopped in 1989. He used to use speed, LSD, PCP and pot and says he never did any other those (sic) drugs since 1989." (AR 693).

C. **Plaintiff's Testimony**

Plaintiff testified that he became disabled July 1, 2007, and that he has not done any kind of work since that date. (AR 57-58). Plaintiff confirmed that he last underwent hemorrhoid surgery in

12

February 2008, and that he had two out-patient procedures in June and July 2009. (AR 60-61). Plaintiff stated that he cannot work "because [his] right side gets numb where it goes into stiffness where [he] can't even move it." (AR 63). Plaintiff noted that "[t]he pain in [his] rectum sometimes gets so bad that [he has] to lay down" and that "[t]he bleeding is still continuous." (Id.). Plaintiff testified that his "condition requires [him] to go to the restroom more than six times a day" and that he lies down six hours a day between 8am and 5pm. (AR 66, 75). Plaintiff states that "[a]ll [he] want[s] to do is just sleep or lay down and [he] can't really. [He's] constantly tossing and turning because when [he] get[s] to one side, the pain gets unbearable." (AR 72). Plaintiff stated that he stopped working at a roofer in July 2007 because of dizziness, numbness in his side, and head pain. (AR 78). Plaintiff stated that he reported these conditions to Dr. Eskander, but the record does not reference any of these complaints. (AR 79-81). In addition, Plaintiff's statements that he sleeps or lies down for 6 hours during the day is not reflected in treatment or progress notes of any of Plaintiff's doctors. (See AR 366).

Plaintiff stated that "[he] goes into rages, emotional rages where [he is] cursing, swearing, yelling. [He has] [s]uicidal thoughts where [he] just want[s] to end it and be through with it so [he doesn't] have to deal with nothing else." (AR 63). Again, there are no treatment or progress notes to confirm these symptoms. Plaintiff testified that he had been having suicidal thoughts from July 2007 until the present (October 2009). (AR 65-66).

\\

\\

D.    **The Vocational Expert's Testimony**

Sandra Fioretti, an impartial vocational expert ("VE"), testified on October 19, 2009 (AR 20, 54, 81-86).  The ALJ provided the following hypothetical question to the VE:

> Assume an individual that's able to perform a full range of medium work except that the work place should be close to a bathroom facility.  Assume an individual that should not be responsible for the safety of others or perform any safety operations.  Should not perform any work requiring hyper vigilance and that means intense sustained concentration such as a lifeguard or air traffic controller.  Based on these circumstances, could this hypothetical person perform any of the [Plaintiff's] past work either as actually or as generally performed?

(AR 84).  The VE responded that these limitations "would allow for work as the janitor and generally the short order clerk."  (Id.).

The ALJ posed a second hypothetical question to the VE:

> [A]ssume an individual who because of symptoms including treatment would be absent from work and/or off tasks at work 20 percent of the time.  Would this individual be able to perform any of the past work or any other work?

(Id.).  The VE responded "no," i.e., that this individual would not be able to perform any past or other work.  (AR 84-85).  The VE noted that if Plaintiff were to take restroom breaks six times per day at irregular intervals, this "frequency . . . would eliminate all work." (AR 85-86). Plaintiff's attorney presented the VE with a hypothetical that included additional mental limitations, but he subsequently withdrew the question.  (AR 86).

## IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[6] and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

---

[6]    Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. §§ 404.1520(b)-404.1520(f)(1) & 416.920(b)-416.920(f)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54 (citing Tackett).  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work

that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity,[7] age, education, and work experience. <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing <u>Tackett</u>). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

## V.

## THE ALJ'S DECISION

The ALJ employed the five-step sequential evaluation process discussed above. At the first step, the ALJ indicated that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of his disability on July 1, 2007. (AR 14). Second, the ALJ found that Plaintiff suffered from the following "severe" impairments: "hemorrhoids and associated intestinal disorders, status post surgery; and an anxiety disorder." (<u>Id.</u>). At the third step, the ALJ found that "[Plaintiff did] not have an impairment or combination of impairments

---

[7]    Residual functional capacity is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (Id.). In the fourth step of his analysis, the ALJ weighed the medical evidence and the claimant's own description of his activities of daily living in determining Plaintiff's residual functional capacity. (AR 14-15). The ALJ found that "[i]n activities of daily living, the [Plaintiff] has no restriction [and] "[i]n social functioning, the claimant has mild difficulties." (AR 15). The ALJ incorporated the limitations prescribed by the vocational expert and the consultative medical examiners, and found that "[Plaintiff] has the residual function capacity to perform medium work . . . [but that] [t]he [Plaintiff's] workplace must be in close proximity to a restroom. [Plaintiff] should have no responsibility for the safety of others or safety operations, and should not perform any work requiring hypervigilance." (Id.).

The ALJ noted that he considered third-party statements, but that "greater weight is accorded the objective medical evidence, longitudinal treatment records, and the opinions of the consultative examiners and state agency." (Id.). The ALJ found that the "[Plaintiff's] physical impairments improved within and under 12 months of onset to the point that residual signs and symptoms have been well managed conservatively.[8] Further, [the] alleged mental impairments are not demonstrated in ongoing treatment records at the degree of the limitation alleged, but

---

[8] The ALJ noted in his opinion that "[f]rom the date the claimant alleged he became disabled . . . he experienced a period of time where his condition could well have adversely impacted his ability to work. However, this period- from the [alleged onset date] in July 2007 through March 2008- is less than 12 months, and therefore is an insufficient period of time to qualify for a period of disability." (AR 16, see also 42 U.S.C. § 416(i)(1)).

18

rather, are quiescent and controlled with treatment and medication."
(AR 20).

The ALJ found that Plaintiff is "capable of performing his past relevant work as a janitor and short-order cook." (Id.). The ALJ noted that "[t]his work does not require the performance of work-related activities precluded by the claimant's residual function capacity." (Id.).

# VI.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)). "Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2

F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner.  Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff argues that the ALJ: (1) failed to properly consider Plaintiff's treating physician's opinion and properly develop the record; (2) failed to properly consider the residual function capacity; (3) failed to pose a complete hypothetical question to the vocational expert; and (4) failed to properly consider the demands of Plaintiff's past relevant work.  (Memorandum in Support of Complaint ("Compl. Mem.") at 4-18).  The Court disagrees with each of these contentions.

## A.    The ALJ Did Not Fail In His Duty To Develop The Record

Plaintiff contends that "the ALJ should have properly considered and recontacted Dr. Multani to fully develop the record regarding his opinion and obtain further evidence about what the [P]laintiff can do despite his impairments."  (Compl. Mem. 9).  Plaintiff asserts that "[h]ad the ALJ left the record open to obtain additional documentation regarding [P]laintiff's treatment by his treating physician he would have obtained the objective medical evidence needed to render a proper decision regarding the [P]laintiff's mental limitations."  (Id.).  The Court disagrees.

The ALJ has an affirmative duty to fully and fairly develop the record in a social security case. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001). However, only ambiguous evidence, or the ALJ's own findings that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry or gather additional information. <u>Id.</u>; <u>see also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958 (9th Cir. 2002) (duty not triggered where the ALJ did not make a finding that the medical report was inadequate to make a disability determination).

Here, Plaintiff's allegation that the ALJ needed to recontact Dr. Multani is without merit. The ALJ did not make a finding that Dr. Multani's medical records were too ambiguous or inadequate to allow for proper evaluation of the evidence. (<u>See</u> AR 16). Instead, the ALJ noted that the record contained disputed evidence regarding Plaintiff's mental health. Specifically, the ALJ found that Dr. Multani's assessment contradicted the findings of the consultative examining psychiatrist who "concluded that the claimant's workplace functioning was not significantly impaired." (AR 17). The ALJ does not have a duty to develop the record when confronted with disputed evidence. <u>See</u> <u>Tonapetyan</u>, 242 F.3d at 1150; <u>see also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958 (9th Cir. 2002) (noting that when faced with contradictory evidence the ALJ did not have a duty to recontact the evaluator to resolve the perceived conflict).

Moreover, the ALJ did seek sought additional evidence from Dr. Hudson and developed the record through a consultative examination with a psychiatrist. (<u>See</u> AR 17). Dr. Hudson became Plaintiff's treating

21

physician after Plaintiff stopped seeing Dr. Multani in March 2008. (See AR 62, 661). The ALJ found that Dr. Hudson's opinions were "not supported by treating records." (AR 17). One way the ALJ may develop the record is to recontact the claimant's medical sources. The Commissioner will recontact medical sources when the medical evidence "is inadequate" for the Commissioner to determine whether a claimant is disabled. 20 C.F.R. § 416.912 (e). The Commissioner will either seek additional evidence or clarification from the treating physician when a medical report contains a "conflict" or an "ambiguity" that must be resolved. 20 C.F.R. § 416.912(e)(1). However, the Commissioner does not need to recontact the treating physician when she knows from "past experience that the source either cannot or will not provide the necessary findings." 20 C.F.R. § 416.912(e)(2) and (f). The Commissioner will then ask the claimant to attend a consultative examination instead. 20 C.F.R. § 416.912(f).

Here, the ALJ appropriately investigated by writing "to Dr. Hudson to give her the opportunity to explain her opinions." (AR 17; see AR 138-139). The Agency noted in its letter to Dr. Hudson that the documents it had received "do not provide [the Agency] with the information [it] need[s] to properly evaluate [Plaintiff's] impairments and/or disability." (AR 138). Specifically, the Agency asked Dr. Hudson to "identify the objective clinical data which in [her] view support[ed] each assessment of 'markedly limited.'" (Id.) (emphasis in original). The ALJ did not receive a response from Dr. Hudson. (AR 17). With respect to Dr. Hudson, the ALJ satisfied his duty to develop the record when he requested additional information and kept the record open so that it could be supplemented by the treating physician's

records.  Additionally, the ALJ developed the record through a consultative examination by psychiatrist Linda M. Smith.  (AR 690). Thus, the ALJ properly developed the record and remand is not required.

**B.   The ALJ Properly Rejected The Treating Doctor's Opinions**

Plaintiff contends that the ALJ "failed to provide specific and legitimate reasons for rejecting [P]laintiff's treating physician's opinion." (Compl. Mem. 6).  Specifically, Plaintiff argues that the ALJ erred in not including "any limitations regarding [Plaintiff's] concentration or interacting with others in [the ALJ's] determination of [P]laintiff's residual functional capacity or in the hypothetical questions to the vocational expert."  (Id.).  The Court disagrees.

Although the treating physicians' opinion is entitled to great deference, it is "not necessarily conclusive as to either the physical condition or the ultimate issue of disability."  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).  "When there is conflicting medical evidence, the Secretary must determine credibility and resolve the conflict."  Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).  When a treating doctor's opinion is contradicted by another doctor, "the Commissioner may not reject his opinion without providing 'specific and legitimate reasons' supported by substantial evidence." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  "The opinion of a nonexamining medical advisor cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining or treating physician."  Morgan, 169 F.3d at 602.  However, a court can reject such an opinion "based in part on the testimony of a nontreating,

nonexamining medical advisor." Id. (emphasis in original); see also Magallanes v. Bowen, 881 F.2d 747, 751-755 (9th Cir. 1989) (affirming an ALJ's decision awarding less weight to a treating physician based on the testimony of a nonexamining physician that was consistent with evidence in the record). In addition, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. See Matney, 981 F.2d at 1019; see also Tonapetyan, 242 F.3d at 1149 ("When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings.") Furthermore, an ALJ can reject a treating physician's assessment of limitations when the physician's clinical notes and other recorded observations regarding Plaintiff's capabilities contradict the assessment. Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001).

**1. Dr. Gurmeet S. Multani**

Dr. Multani treated Plaintiff from October 2007 until March 2008. (AR 62, 277, 661). Dr. Multani reported in an evaluation form for mental disorders that Plaintiff is "depressed and anxious" and has "insomnia and decreased energy." (AR 277). Dr. Multani noted that Plaintiff had "no mood swings" and "[n]o homicidal or suicidal ideations." (AR 278). In terms of Plaintiff's level of functioning, Dr. Multani opined that Plaintiff had "difficulty interacting appropriately" and that he "has poor concentration." (AR 279). Yet Dr. Multani noted that Plaintiff "can complete everyday household routines and follow and understand simple written or oral instructions." (Id.).

24

Dr. Multani found that "[Plaintiff] is able to carry out tasks and work on goals and issues. [He] should be able to go for training for work or apprenticeship for eight hours a day." (Id.). In addition, Dr. Multani noted that "[Plaintiff] is able to take care of funds and basic needs." (AR 280). Dr. Multani diagnosed Plaintiff with Major Depressive Episode and noted that "[Plaintiff's] condition can be expected to improve." (AR 279-80). Dr. Multani also found that Plaintiff's "[j]udgment is fair" and he "appears to be of average intellect and [his] fund of knowledge is appropriate for patient's age and educational level." (AR 278). "[Plaintiff] is able to deal with reality. [Plaintiff] does not present any delusions, hallucinations, paranoid ideations, confusion and mood swings. [He has] [n]o grossly disorganized behavior or looseness of association." (Id.).

The ALJ acknowledged that "Dr. Multani supplied a counsel-initiated standard for report in February 2008." (AR 16). The ALJ noted that "Dr. Multani opined that the [Plaintiff] exhibited poor concentration and difficulty interacting with others." (Id.). Yet the ALJ also observed that "[a]side from self-reported depression and anxiety, no other signs or symptoms of significance were noted and remaining signs were benign." (Id.). The ALJ noted that Dr. Multani's "[t]reatment notes [were] not provided and a comprehensive mental status examination [was] not elucidated." (Id.). The ALJ rejected Dr. Multani's opinion because there was a lack of evidence in the record to support his findings, there were no treating notes, and his findings were contradicted by the consultative psychiatrist. (AR 16-17). The Court finds these reasons to be specific and legitimate reasons to reject Dr. Multani's opinion.

As the ALJ noted in his opinion, Dr. Multani's findings were limited to a four page "evaluation form for mental disorders" which were not supported by any included treatment or progress notes. (AR 16; see AR 277-80). The evaluation form contained only Plaintiff's subjective complaints and Dr. Multani's findings that are not supported by any treatment notes. Moreover, although Dr. Multani notes that Plaintiff has "difficulty interacting appropriately" and that he "has poor concentration", these findings are somewhat undermined by Dr. Multani's finding that Plaintiff is able to carry out tasks and is able to go to training for work eight hours a day. (AR 279). In addition, Dr. Multani noted that "[Plaintiff] is able to take care of funds and basic needs." (AR 280).

Furthermore, Dr. Multani's findings are inconsistent with both Dr. Smith and Dr. Skopec's findings. Dr. Smith opined that "[t]here was no evidence at all of any thought disorder or psychosis" and that Plaintiff's "thought processes were entirely clear and linear and he was coherent and organized." (AR 695). With respect to his intellectual functioning, Dr. Smith found that "[Plaintiff] was alert and oriented in all spheres. [Plaintiff] appeared to be of at least average intelligence." (Id.). Dr. Skopec found that Plaintiff is not significantly limited in his ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 284). Moreover, Dr. Multani's statement appears to contradict Dr. Plaintiff's testimony. As noted, Dr. Multani stated that he observed "[n]o homicidal or suicidal ideations." (AR 278). Yet, in his testimony Plaintiff stated that he had been having

suicidal thoughts from July 2007 until the present (October 2009), and he affirmed that he shared his suicidal thoughts with his mental health care physicians. (AR 65-66). The Court finds that the ALJ provided specific and legitimate reasons supported by the record to reject Dr. Multani's opinion. No remand is required.

### 2.    Dr. Marcia Hudson

In April 2008 Plaintiff began visiting the San Bernardino County Department of Behavioral Health, where he saw a number of physicians including Dr. Hudson. (AR 651-67). Dr. Hudson completed a psychiatric/psychological impairment questionnaire on November 4, 2008. (AR 669-76). Dr. Hudson diagnosed Plaintiff with depression. (AR 669, 674). In terms of Plaintiff's ability to sustain concentration and persistence, Dr. Hudson opined that Plaintiff's condition markedly limited his ability to carry out detailed instructions; to maintain attention and concentration for extended periods of time; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; and to sustain ordinary routine without supervision. (AR 672). On August 21, 2008, Dr. Hudson noted that Plaintiff denied suicidal and homicidal ideations as well as auditory and visual hallucinations. (AR 658). In her October 2, 2008 treatment notes, Dr. Hudson noted that Plaintiff's medication was "effective" and that he was "sleeping well." (AR 657). In September 2009 Dr. Hudson reported that Plaintiff was "well groomed" and had an "improved mood." (AR 750). Dr. Hudson again noted on December 17, 2009 that Plaintiff denied suicidal and homicidal ideations and auditory hallucinations. (AR 780).

As noted above, the Appeals Council received an additional Psychiatric/Psychological Impairment Questionnaire dated June 9, 2010, as well as additional medical records, from Dr. Hudson. (AR 776-783, 808-820). Although the Agency received Dr. Hudson's additional submissions after the ALJ issued his decision, the Appeals Council considered the additional information when it denied Plaintiff's request for review on July 20, 2010. (AR 4-5, <u>see also</u> AR 1-3).

The ALJ concluded that Dr. Hudson's "opinions overstate the claimant's functional limitations." (AR 17). The ALJ found Dr. Hudson's assessment "to be inconsistent with real-life situations" and "not supported by treating records." (<u>Id.</u>). Specifically, the ALJ rejected Dr. Hudson's findings regarding Plaintiff's ability to "maintain regular attendance and be punctual" and his ability to "maintain attention and concentration for extended periods." (<u>Id.</u>). The ALJ stated that "nowhere in [Dr. Hudson's] actual treatment records is there any mention of the claimant's failing to keep any scheduled appointment" or "any report that the [Plaintiff] was inattentive or wasn't concentrating during any office visit." (<u>Id.</u>). The ALJ also noted that Plaintiff "was not only present for the scheduled [administrative] hearing, but was on time as well" and that he "did not demonstrate or manifest any difficulty concentrating during the hearing." (<u>Id.</u>). Furthermore, after noting that Dr. Hudson's opinions were not consistent with her treating records, the ALJ "wrote to Dr. Hudson to give her the opportunity to explain her opinions." (AR 17). As noted above, the ALJ satisfied his duty to develop the record when he requested additional information and kept the record open so that it could be supplemented by additional records from Dr. Hudson. The ALJ

did not receive a response from Dr. Hudson prior to the issuance of his decision. (AR 17, see supra note 5).[9]

Additionally, Dr. Hudson's original findings and her additional submissions are contradicted by Plaintiff's testimony. In her treatment notes, Dr. Hudson noted on August 21, 2008, and again on December 17, 2009, that Plaintiff denied suicidal / homicidal ideations and auditory hallucinations. (AR 780, 658). Yet, in his testimony Plaintiff stated that he had been having suicidal thoughts from July 2007 until the present (October 2009), and that he shared his suicidal thoughts with his mental health care physicians. (AR 65-66).

Moreover, Dr. Hudson's findings were not consistent with the findings of Drs. Smith and Skopec who opined that "[t]here was no evidence at all of any thought disorder or psychosis" and that Plaintiff's "thought processes were entirely clear and linear and he was coherent and organized." (AR 695). Dr. Smith also found that "[Plaintiff] was alert and oriented in all spheres. [Plaintiff] appeared to be of at least average intelligence." (Id.). Dr. Skopec found that Plaintiff is not significantly limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 284). The Court finds these reasons to be specific and legitimate reasons

_____

9   Although not addressed by Plaintiff, the Court notes that Dr. Hudson's additional questionnaire and medical records, which were considered by the Agency's Appeals Council, do not explain her previous statements nor alleviate the ALJ's concerns regarding the consistency of her statements. (AR 1-5, 776-783, 808-820).

supported by substantial evidence in the record to reject Dr. Hudson's opinion. No remand is required.

C. **The ALJ Properly Assessed Plaintiff's Residual Functional Capacity**

Plaintiff contends that the "ALJ omitted from the RFC[] Dr. Multani's opinion regarding Plaintiff's mental limitations." (Compl. Mem. 11). Specifically, Plaintiff contends that "the ALJ failed to include in [P]laintiff's RFC that Dr. Multani opined that [P]laintiff is poorly motivated, he is isolative and withdrawn, he has a poor ability to carry out tacks, he is unable to deal with problems ane issues, he has a poor ability to cope, his concentration is poor and he has difficulty interacting appropriately with others." (Id.). The Court disagrees with Plaintiff's contentions.

A residual functional capacity ("RFC") assessment is not a medical opinion. Rather, it is an "administrative finding" the ALJ reaches after considering all the relevant evidence, including diagnoses, treatment, observations by treating physicians, medical records, and the claimant's own subjective symptoms. See Social Security Ruling 96-5p; 20 C.F.R. § 404.1527 (e)(2) (stating that a residual functional capacity finding is not a medical opinion but an administrative finding that is reserved to the Commissioner). The RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1); Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009); Frost v. Barnhart, 314 F.3d 359, 366 (9th Cir. 2002).

In determining Plaintiff's residual function capacity, the ALJ considered the opinions of Drs. Multani, Hudson, Eskander, and Smith, and he also considered Plaintiff's credibility. (AR 15-20). The ALJ found that "[Plaintiff] has the residual function capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)" with two exceptions. (AR 15). The ALJ noted that "[Plaintiff's] workplace must be in close proximity to a restroom [and that Plaintiff] should have no responsibility for the safety of others or safety operations, and should not perform any work requiring hypervigilance." (AR 15). The ALJ found that the "alleged mental impairments are not demonstrated in ongoing treatment records at the degree of limitation alleged, but rather, are quiescent and controlled with treatment and medication. Accordingly, the claimant's allegations of the degree of impairment and limitation are not credible." (AR 20).

Here, the ALJ determined Plaintiff's RFC after carefully considering Plaintiff's treating physician's reports, the consultative examiner's findings and conclusions, Plaintiff's testimony, and other relevant medical evidence included in the record. The ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (AR 15). In interpreting the evidence and developing the record, an ALJ need not discuss all of the evidence presented. Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (noting that "in interpreting the evidence and developing the record, the ALJ does not need to discuss every piece of evidence.") (internal citation omitted). This Court finds that the ALJ's RFC was based upon substantial evidence in the record.

A medium RFC with some limitations was appropriate, based upon the medical and other evidence. The ALJ properly assessed Plaintiff's exertional limitations based on Plaintiff's recovery after his second hemorrhoid surgery. The final microscopic diagnosis of the internal hemorrhoids showed benign anorectal hemorrhoidal tissue and no evidence of malignancy. (AR 336, 620). In addition, in a follow-up visit, Dr. Kearney noted that "[Plaintiff] ha[d] no active bleeding apparent" and Plaintiff has only received out-patient treatment since his final surgery. (AR 60-61, 628, 678-79, 683-89, 700, 742-45). In her consultative assessment, Dr. Eriks noted that Plaintiff's impairments do not affect his ability to lift and carry, stand and walk, sit, manipulate his hands, or communicate. (AR 707-09). Dr. Eriks also opined that Plaintiff has no postural or environmental limitations. (AR 708-10). The exertional limitations that the ALJ included in the RFC are supported by the record.

With respect to his alleged mental limitations, the ALJ's RFC is consistent with the findings of Dr. Smith, Dr. Skopec, and the remaining record. As noted, Dr. Smith found that "[t]here was no evidence at all of any thought disorder or psychosis" and that Plaintiff's "thought processes were entirely clear and linear and he was coherent and organized." (AR 695). The ALJ properly considered all of the findings in the record, and, as noted, as long as the ALJ took those findings into consideration in determining Plaintiff's RFC, the ALJ's decision is correct.

Even if the ALJ should have considered additional non-exertional limitations, this consideration would have only led to a slight

modification of the RFC, and therefore any error was harmless error because Plaintiff would still have been found not disabled.  <u>See</u> <u>Carmickle v. Comm'r</u>, 533 F.3d 1155, 1162 (9th Cir. 2008) (if ALJ's error was inconsequential to the ultimate nondisability determination, no remand required); <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless.").   No remand is required.

**D.    The ALJ Properly Found That Plaintiff Could Return To His Past Relevant Work**

Plaintiff contends that the "ALJ failed to pose a complete hypothetical question to the vocational expert." (Compl. Mem. 13). Specifically, Plaintiff argues that "the ALJ failed to include in the hypothetical questions to the VE" Dr. Multani's mental limitations. (<u>Id</u>. at 13-14).   Plaintiff further contends that the "ALJ failed to properly consider the demands of [P]laintiff's past relevant work." (<u>Id.</u> at 15).   Plaintiff contends that the "mental impairments and limitations as determined by Dr. Multani have significant vocational ramifications . . . [because] Plaintiff would not be able to perform him past relevant work as a janitor and short-order cook." (<u>Id.</u> at 14). Plaintiff argues that "had the ALJ properly considered [P]laintiff's treating source opinions, he would have determined that based on his mental limitations, [P]laintiff is unable to perform any of his past relevant work."[10]   (<u>Id.</u> at 16).   The Court disagrees.

---

[10]   As noted, Plaintiff does not appear to contest the physical limitation findings of the ALJ.  (See Compl. Mem. 15-18).

The ALJ determined that Plaintiff was "capable of performing his past relevant work as a janitor and short-order cook." (AR 20). The ALJ noted that "[t]his work does not require the performance of work-related activities precluded by the [Plaintiff's] residual function capacity." (Id.)

Plaintiff did not satisfy his burden of proving that he could not return to his previous work. Here, the ALJ's RFC contained all limitations supported by substantial evidence in the record. As noted above, the ALJ's rejection of Dr. Multani's findings of mental limitations was proper. Therefore, the ALJ properly relied on the findings of the consultative physician in forming his RFC determination and in forming the hypothetical for the VE.

Additionally, the Court notes that the determination at step four that a claimant can perform his past relevant work need not be supported by vocational testimony. See Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996) (noting that the "determination that [the plaintiff] could perform his past relevant work . . . negate[d] his argument that the ALJ erred in the application of the medical-vocational guidelines.").

Here, although no VE testimony was required to find that Plaintiff could return to his past relevant work, the VE's testimony strongly support's the ALJ's finding. "The hypothetical an ALJ poses to a vocational expert, which derives from the RFC, must set out all the limitations and restrictions of the particular claimant." Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009) (internal quotation marks omitted). However, "[a]n ALJ is free to accept or

reject restrictions in a hypothetical question that are not supported by substantial evidence." Osenbrock v. Apfel, 240 F.3d 1157, 1164-65 (9th Cir. 2001).

The ALJ posed the following hypothetical question to the VE:

> Assume an individual that's able to perform a full range of medium work except that the work place should be close to a bathroom facility. Assume an individual that should not be responsible for the safety of others or perform any safety operation. Should not perform any work requiring hyper vigilance and that means intense sustained concentration such as a lifeguard or air traffic controller. Based on these circumstances, could this hypothetical person perform any of the [Plaintiff's] past work either as actually or as generally performed?

(AR 84). Based on this hypothetical question, which included the appropriate non-exertional limitations for Plaintiff, the VE testified that these limitations "would allow for work as the janitor and generally the short order cook." (Id.).

The Court finds that the ALJ's conclusion that Plaintiff could return to his past relevant work is supported by substantial evidence in the record. Accordingly, no remand is required.

**VIII.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.   IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: July 14, 2011.

                                     _____/S/_____
                                     SUZANNE H. SEGAL
                                     UNITED STATES MAGISTRATE JUDGE